H66JGUES                    Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        11 Cr. 921-01 PKC

5   JULIO GUERRERO,

6                Defendant.

7   ------------------------------x

8                                       June 6, 2017
                                        11:15 a.m.
9


10

11  Before:

12                  HON. P. KEVIN CASTEL,

13                                      District Judge

14

15                  APPEARANCES

16  JOON H. KIM,
         United States Attorney for the
17       Southern District of New York
    BRENDAN FRANCIS QUIGLEY,
18  REBEKAH ALLEN DONALESKI,
    LAURIE ANN KORENBAUM,
19       Assistant United States Attorneys

20  DLA Piper US LLP (NY),
         Attorneys for defendant Guerrero
21  BY:  PATRICK J. SMITH, Esq.
         PETER JOHN COUTO, Esq.
22                  Of counsel

23  Also Present:
         MERCEDES AVALOS, Certified Spanish Interpreter
24       ERIKA de los RIOS, Certified Spanish Interpreter

25

1           (In open court)

2           (Case called)

3           THE COURT:  Please be seated.  Good morning to you

4    both and good morning, Mr. Guerrero.

5           Mr. Smith, what I am going to do, I am going to go

6    through the materials that I have, and the first question will

7    be whether I have everything I should have.

8           I have a presentence report, recommendation and

9    addendum, revised by Probation on January 30th, 2017.  I have a

10   redacted and unredacted sentencing memorandum transmitted on or

11   about February 3, 2017 from you and your office.  I have a

12   letter from an Angel Melendez, Department of Homeland Security,

13   enclosing another letter, and that's what I have on the subject

14   of sentencing.  Do I have everything I should have?

15          MR. SMITH:  You should have a letter from the

16   government, dated February 7, 2017.

17          THE COURT:  I apologize for not mentioning that.  I

18   have it right here.  I put it aside thinking I mentioned it.

19   So I certainly have that letter and I have read it.  Do I have

20   everything I should have?

21          MR. SMITH:  Yes, your Honor.

22          THE COURT:  Has the defendant, in fact, read, reviewed

23   and discussed with you the presentence report, recommendation

24   and addendum?

25          MR. SMITH:  He has, your Honor, with Mr. Couto.

H66JGUES                          Sentence

1              THE COURT:  Does the defendant have any objections to

2    the facts set forth in the presentence report?

3              MR. SMITH:  No, your Honor.

4              THE COURT:  Does the defendant have any objections to

5    the facts set forth in the government's February 7 letter?

6              MR. SMITH:  No, your Honor.

7              THE COURT:  Does the defendant have any objection to

8    the guideline calculations set forth in the presentence report?

9              MR. SMITH:  No, your Honor.

10             THE COURT:  All right.  Does the government have any

11   objection to the facts set forth in the presentence report?

12             MR. QUIGLEY:  No, your Honor.

13             THE COURT:  Does the government have any objection to

14   the guideline calculation set forth in the presentence report?

15             MR. QUIGLEY:  No, your Honor.

16             THE COURT:  All right.  At this time I'll allow you to

17   make your motion under 3553 (e).  I will then hear from

18   Mr. Smith and Mr. Guerrero, and following that I'll give the

19   government an opportunity to speak at any further length if

20   they wish.

21             MR. QUIGLEY:  Yes.  At this time the government moves,

22   pursuant to Title 18, United States Code, Section 3553 (e) and

23   Section 5K1.1 of the guidelines that the court sentence the

24   defendant in light of the factors set forth in 5K1.1.

25             THE COURT:  All right.  There is no objection,

 1    correct, Mr. Smith?

 2              MR. SMITH:  No, your Honor.

 3              THE COURT:  So that motion is granted.  I'll now give

 4    you an opportunity to speak.

 5              MR. SMITH:  May I use the lectern?

 6              THE COURT:  You may.  I have a few questions that you

 7    could help me with.  It seems to me this defendant has been in

 8    on the present charges for which I am sentencing him today

 9    since about 2014.  Is that correct, sir?

10              MR. SMITH:  Judge, I don't think that is correct.

11              THE COURT:  All right.  So please tell me how long he

12    has been in on the present charges.

13              MR. SMITH:  So Mr. Guerrero was originally arrested on

14    July 2, 2002 on a case he pled guilty to, Hobb's Act robbery

15    and 924 (c) charge.

16              THE COURT:  Who was that pending before?  It was in

17    this district?

18              MR. SMITH:  It was in this district.

19              MR. QUIGLEY:  Judge Berman, your Honor.

20              THE COURT:  Thank you.

21              MR. SMITH:  One of the points I hope to get across

22    today is that is related conduct.  If this were all one case,

23    that Hobb's Act robbery and firearms charges would be included

24    in the grouping analysis you see in the PSR.  He went in on

25    July 2, 2002, was sentenced to 122 months, so 10 years, two

1    months.  The max discharge date on that sentence was August of

2    2011, and with good time, Mr. Guerrero would have been

3    released, as I understand it from the Bureau of Prisons'

4    calculation, in June of 2011.

5            THE COURT:  Well, based on his conduct as reflected in

6    the PSR, would he have been eligible for good time?

7            MR. SMITH:  I think the PSR reflects the amount of

8    good time that was deducted.  You're referring to the various

9    incidents over the course of incarceration --

10           THE COURT:  Yes.

11           MR. SMITH:  -- only two of which took place during the

12   term of the original sentence.

13           The third one was a 2013 episode, and they logged the

14   amount of good time that was deducted.  Even if we assume the

15   maximum term of the sentence that was imposed, he would have

16   been in for roughly 10 years, but I think with good time,

17   sometime in 2011 he would have been released.

18           THE COURT:  Okay.

19           MR. SMITH:  He has been in custody on this charge

20   since the summer of 2011, so five years and three quarters,

21   approaching six years.

22           The way I would hope your Honor would look at these

23   cases and the way I look at them is that the robbery scheme,

24   the pattern, the types of narcotics trafficking and use of

25   firearms were part of the information that Mr. Guerrero

1  provided to the government when he began to cooperate.  Indeed,

2  as the government's 5K letter notes, the initial failed attempt

3  at cooperation revealed dozens of Hobb's Act robberies, the

4  dozens that are now detailed in the PSR.  It is approximately

5  40 that are included in the relevant conduct.

6          So Mr. Guerrero got across his participation in a

7  series of robberies targeting narcotics traffickers with the

8  use of firearms throughout the 1990's and 2000's prior to his

9  sentencing on the original case.

10          Like I said, if that had all been packaged together,

11  he would have been facing a sentence before your Honor and

12  another judge of a scope of conduct that is set forth in the

13  information and summarized in the PSR.  He is now here, if you

14  look at it from that perspective, having been in custody for

15  nearly 15 years.

16          THE COURT:  You're not suggesting, are you, that the

17  case before Judge Berman included meeting or agreeing with

18  co-conspirators to commit a murder for hire, are you?

19          MR. SMITH:  I am not suggesting that.  I am talking

20  about the robbery, the drug trafficking and firearms component

21  of the charges in the information that Mr. Guerrero pled to in

22  this case.

23          THE COURT:  How many Hobb's Act robberies were

24  included in the case before Judge Berman?

25          MR. SMITH:  I think it was just the one.  My point

1   here is that the government --

2           THE COURT:  So for the one, he got 10 years?

3           MR. SMITH:  For the one, he got the 10 years.

4           THE COURT:  And there are a total of 40?

5           MR. SMITH:  That's correct.

6           THE COURT:  Plus two murders?

7           MR. SMITH:  That's correct.  The conduct is, my point

8   is the conduct is related.  Had this been one case, it would

9   all have been relevant conduct.  Had the cooperation succeeded

10  in the 2003-2004 time-frame, in other words, if Mr. Guerrero

11  had gotten past the inhibition to provide information to the

12  government about the murder conspiracy and additional robberies

13  that came out in the details of the proffering, you would be

14  here, your Honor, sentencing a cooperator today who has served

15  for the full scope of his conduct approximately 15 years, which

16  is I think the equivalent with good time of about a 17-year

17  sentence.  So the conduct is clearly related.

18          THE COURT:  There are a lot of ifs in there that are

19  counterfactual.

20          MR. SMITH:  The ifs, though -- the counterfactual, it

21  is certainly clear the cooperation did not succeed 2003-2004,

22  and that later Mr. Guerrero stepped forward in 2005 and

23  restarted the cooperation process which ultimately was

24  successful.  I would say by the time I was appointed as CJA

25  counsel, which I think was sometime in 2007-2008, he had the

1   prior counsel and already had gone down the path of providing

2   truthful information about the murders and the related conduct,

3   and that was all under way.

4          That process then led to approximately, from the time

5   the cooperation started in earnest until he pled guilty to the

6   information in front of Judge Cote, it was about six years of

7   process in there, six years that I would submit to your Honor

8   was a timeline that was just not up to Mr. Guerrero or me, for

9   that matter, and over time while we have encouraged the

10  government to see if we can somehow go faster, it just didn't

11  develop that way.

12         The way it developed was that there were fugitives.

13  There was an initial investigation.  It took a long time to

14  bring Mr. Gracesqui who, your Honor, provided over that trial,

15  to charge him and to get that case ready for trial, dealing

16  with other co-defendants against whom Mr. Guerrero provided

17  information, to be able to develop those cases, develop those

18  cooperators and ultimately build that up into the very

19  significant prosecution that was the Gracesqui, also known as

20  the muffler prosecution.

21         This significant period of delay here I would think is

22  one of the extraordinary factors that is at play in this

23  sentencing, and I suppose the question I would encourage your

24  Honor to consider is that given the relatedness of the conduct

25  in the case before Judge Berman, and the nature of the crimes

1    to which Mr. Guerrero has pleaded guilty in this case, that the

2    question I would encourage your Honor to consider is how much

3    incremental punishment is necessary, after having served nearly

4    15 full years, roughly the equivalent of a 17-year sentence,

5    how much is necessary to achieve the objectives of Section 3553

6    (a) in light of Mr. Guerrero's, what I would submit,

7    exceptional cooperation as reflected in the 5K letter and the

8    other facts and circumstances that are present here.

9              THE COURT:  What sentence did Mr. Gracesqui receive in

10   this case?

11             MR. SMITH:  He received a life sentence, your Honor.

12             One is, as laid out in the 5K letter, and I hope that

13   the government will address this, is that the cooperation,

14   since the cooperation agreement was signed and, indeed, for the

15   years prior, before Mr. Guerrero tendered his plea of guilty

16   was strong, exceptionally strong, a track record of providing

17   truthful, reliable information about very serious conduct and

18   very serious actors.

19             I don't think I need to go into detail about the

20   nature of the conduct.  Your Honor heard from Mr. Guerrero at

21   the trial.  I think your Honor at this point probably knows

22   better than I do the depth and the seriousness of the crimes,

23   but also the quality of Mr. Guerrero's testimony and the

24   credibility with which his testimony was received by the jury.

25   I think it was an essential factor in Mr. Gracesqui's

H66JGUES                         Sentence

1    conviction, a conviction that, as your Honor has pointed out,

2    led to a sentence of life imprisonment.

3           As you may know, your Honor, Mr. Guerrero is prepared

4    to continue cooperating.  I think the government has undertaken

5    the extraordinary step of working with the Department of

6    Homeland Security to obtain a deferred action on the potential

7    deportation that may occur, so he will be available in the U.S.

8    to continue his cooperation and to provide additional testimony

9    against other high-value targets of the investigation,

10   including the individual identified as Mercedes, a prosecution

11   we understand may be forthcoming.

12          So in terms of the quality of his cooperation in a

13   violent gang case like this, one involving very serious crimes,

14   I think we should consider the quality of Mr. Guerrero's

15   cooperation as exceptional. .  I am sure on the issue of is

16   incremental punishment necessary, a concern, of course, your

17   Honor needs to consider is what the the risk of recidivism?

18   What is the danger to the community were you to act on our

19   request that a sentence of time-served is appropriate?

20          As an initial matter, your Honor, the man who sits

21   before you is in his early 50's, a different man from the man

22   who was arrested in 2002.  I think he has expressed his remorse

23   through his testimony, through his acts, through stepping

24   forward and tendering his cooperation under circumstances where

25   it was known to him if he simply sat still in MCC, he had a

H66JGUES                            Sentence

 1   reasonably good shot at being released in 2011.  His release

 2   date or expected release date was published.  Anybody could

 3   look it up on the Bureau of Prisons web site, and sitting

 4   silently probably was a pretty good shot at getting out within

 5   a relatively short time-frame, but that was not the path that

 6   Mr. Guerrero chose because he simply wanted to make things

 7   right, and making things right meant coming clean on all of the

 8   acts you heard about here in the courtroom when he testified.

 9            As a general matter, the risk of recidivism, the

10   studies show, and we noted this in our memo, go down

11   substantially when an offender passes the age of 50.  That

12   general lack of recidivism, I think the rate is somewhere in

13   the single digits, but that is not really much comfort, I

14   think, your Honor.

15            What should be comforting is Mr. Guerrero has done

16   very, very well in terms of his adjustment in MCC.  He has had

17   a very positive track record in terms of work and achievement

18   in MCC.  Your Honor did note a few disciplinary incidents.  He

19   has been punished for those.  The last one in 2013 resulted

20   from a fight in which he was attacked.  He was not the

21   instigator or initiator of that episode.

22            I think what adds to the mix, the risk of recidivism

23   is sitting in the second and third rows on the end here in this

24   courtroom, and that is the exceptional family support that

25   Mr. Guerrero enjoys.  His long-time partner and mother of

1   children is here in court.  It is rare, certainly rare in my

2   experience that a spouse or a partner stands by a husband or

3   partner throughout an ordeal of this long, almost 15 years.

4   They visited him.  Mr. Guerrero has been in regular contact

5   with his family, with his children.  He is now a grandfather.

6   There is regular contact and support.

7           What is waiting for him when he is released is a

8   support network, including potential employment.  He has a

9   place to reside.

10          THE COURT:  Where?

11          MR. SMITH:  I think he will be residing at his

12   brother's.  He has a job lined up.

13          THE COURT:  Where?

14          MR. SMITH:  He is qualified as a welder in the Bronx,

15   your Honor.  I need to check the address.

16          THE COURT:  That is sufficient.  What makes you think

17   he is going to be in the Bronx?

18          MR. SMITH:  Well, if he is successful, and the

19   application that the government is making is successful, he

20   will not be deported and he --

21          THE COURT:  I didn't know this.  I didn't get this

22   from the submission the government made, but do tell?

23          MR. SMITH:  I think what has been and what has caused

24   some delay in the sentencing is that the prosecution, and I

25   can -- we have gone back-and-forth -- the plan is that a

H66JGUES                           Sentence

1    deferred action has been obtained through the Department of

2    Homeland Security, and as a result of deferred action, Homeland

3    Security, Immigration & Customs Enforcement will not act on the

4    deportation proceeding.

5           Mr. Guerrero will be permitted to remain in the U.S.

6    and he would be at liberty in the community subject to the

7    typical terms of supervised release.  The plan is that he would

8    reside in the Bronx with his family and return to something

9    approaching a normal life for a man in his early 50's.

10          THE COURT:  So your understanding is the government

11   has applied for permission for Mr. Guerrero to reside in the

12   United States?

13          MR. SMITH:  That is correct, your Honor.

14          THE COURT:  On a permanent basis?

15          MR. SMITH:  I don't know about a permanent basis.

16          THE COURT:  Well, on what basis?

17          MR. SMITH:  The deferred action means that there would

18   be no action on potential deportation.  The basis for that

19   application is his ongoing cooperation.  There may come a time

20   when that process ends, and then he would again be

21   deportation-eligible, as I understand it, and he would subject

22   to potential deportation proceedings.  If I am misstating

23   anything, I would encourage the government to weigh in.

24          THE COURT:  I am going to get to the government on

25   this.  They will be responding to my questions.  My

1  understanding is this is a deferred action for one year.

2          Have you had discussions with the government about the

3  subject of Mr. Guerrero remaining in the United States beyond

4  the one-year period?

5          MR. SMITH:  I have not.  What I understand is that

6  potentially subject to extension, if the cooperation that is

7  the basis for that deferred action application is not

8  completed, then there would be a potential process where we

9  would ask for additional time.

10          I think your Honor framed it exactly correctly.  It is

11  initially one year and maybe there would be additional time.

12  So I think we understand and Mr. Guerrero understands that

13  there is no right to reside on a permanent basis in the U.S.

14  There would be this interim period where he is being kept

15  around as a function of his cooperation.

16          THE COURT:  Thank you.

17          MR. SMITH:  During that time, if your Honor were to

18  grant our request for a time-served sentence, the support

19  network that I think is essential for success when one is

20  re-integrating into society would be present, and the family

21  ties and ability to support would buttress I think what we all

22  understand as a -- "buttress" isn't the right word -- enhance

23  the low risk of recidivism here.

24          I would like to make just one other point about the

25  nature of Mr. Guerrero's period of incarceration.  He has been

1    in detention at MCC, and for a brief period -- in this context,

2    it may be brief -- a brief period held at MDC.  He was never

3    designated out to a Bureau of Prisons facility.

4            As I am hopeful your Honor is aware, MCC time and MDC

5    time is harsh time.  I am not so sure what the right word for

6    it is, but 15 years of full time MDC without a yard, without

7    significant outdoor time, in that time the urban prison

8    environment is a very harsh way to serve a full sentence, which

9    he has essentially done on the underlying case, and he served

10   the nearly six years, if my math is correct, on the case your

11   Honor's about to sentence him on.

12           I would just like your Honor to please take into

13   consideration how harsh that time is in fashioning an

14   appropriate sentence here.  So on the term of how much

15   incremental punishment is necessary, maybe if I sort of frame

16   that in terms of what the Probation Department's recommendation

17   is, they're recommending 10 years on this case.  I am not so

18   sure the recommendation adequately picks up on the issue of

19   whether the cases are related; in other words, whether the

20   other case would be relevant conduct to this case.

21           Just setting that aside, if we just did the math on

22   the 10-year recommendation, that would be with good time

23   approximately 9 years of a sentence.  He has already served six

24   years of that time, so Probation's recommendation implicitly is

25   recommending three years of incremental punishment.

1          I would submit to your Honor that for the reasons I am

2     stating, those additional three years, given the harshness of

3     the MCC sentence to date, the efforts at cooperation and the

4     support of the government through its 5K and all the other

5     factors that are in issue here, and the likelihood that

6     Mr. Guerrero has undergone the type of rehabilitation and

7     transformation that we would all hope for in this system,

8     right, that an offender really gets it through work inside,

9     taking on responsibility in terms of prison jobs, understanding

10    the depth of the wrongfulness of their conduct and trying to

11    make amends through this process of cooperation, I would submit

12    that all that adds up to, your Honor, the recommended

13    additional three years of incremental punishment are not

14    necessary to achieve the objectives of what is set forth in

15    3553 (a), that a sentence of time-served, which is essentially

16    a sentence of approximately 17 years on all of the conduct

17    together, or put another way, a sentence of approximately seven

18    years on the case that is before your Honor, although I

19    wouldn't unpack it that way, I would consider is together, we

20    submit that is sufficient in this case, and that is our

21    application here, a sentence of time-served.

22          THE COURT:  Thank you, Mr. Smith.

23          Mr. Guerrero, this is your opportunity to speak, to

24    bring to my attention any facts or circumstances that you

25    believe I should take account of in passing sentence upon you

H66JGUES                         Sentence

 1    today.  If there is anything you wish to say, this is the time

 2    to say it.

 3                THE DEFENDANT:  Yes.  There is no excuse in my case.

 4                I would like to extend my apologies to the family of

 5    the victim in this case.  I would like to ask the Government of

 6    the United States for forgiveness.  I would like to express my

 7    gratitude to this country for giving me the opportunity to come

 8    here.  I have changed my way of being in the time that I have

 9    been incarcerated.  I want to ask my siblings and my family for

10    forgiveness.

11                To someone who is very special in my life, Bianchi,

12    forgive me and thank you for everything that you have done for

13    our children.  May God bless you all and thank you.

14                THE COURT:  Thank you, Mr. Guerrero.  Who is going to

15    speak on behalf of the government?

16                MR. QUIGLEY:  I will, your Honor.

17                THE COURT:  Did you know of Mr. Hunt's application to

18    Homeland Security?

19                MR. QUIGLEY:  Yes, your Honor.  That had been approved

20    yesterday, I believe.

21                THE COURT:  No.  I mean the government approved the

22    application before it was made?

23                MR. QUIGLEY:  Absolutely, your Honor, yes.

24                THE COURT:  And this was a matter that you consulted

25    with your colleagues on?

1            MR. QUIGLEY:  Yes.

2            THE COURT:  Correct?

3            MR. QUIGLEY:  Yes.

4            THE COURT:  And your proposal is to have this man who

5    has admitted to 40 Hobb's Act robberies or Hobb's Act robberies

6    and/or burglaries, and two -- well, I'll say one contract

7    killing and one killing by a co-conspirator in the course of a

8    robbery, have this man roam the streets of New York.  Is that

9    your proposal?

10           MR. QUIGLEY:  Your Honor, I would say two things to

11   that:

12               Number one, he is going to be supervised, if he is

13   released, he will be supervised by Probation, and potentially

14   if your Honor ordered it, have additional supervision by the

15   government, by an investigator from our office;

16               Secondly, he won't be roaming the streets.  He will be

17   supervised;

18               Second, it is for a limited duration.  This is a

19   deferred action.  It is simply intended to ensure his ability

20   to be called as a witness at the Mercedes trial if and when

21   that takes place.  It is currently scheduled for later this

22   year.  At the end when he is no longer needed as a witness for

23   that trial, and he knows this, he has been told this, he will

24   be deported by Immigration.

25           THE COURT:  Who is going to notify Immigration?

H66JGUES                          Sentence

```
 1        How do I have any confidence that this isn't going to
 2   be a slip between the cracks, as I have seen in other cases
 3   from your office?
 4        MR. QUIGLEY:  Immigration is obviously the person who
 5   grants him or the entity that grants him the deferred action.
 6   We will advise immigration at the end of this, whether it is at
 7   the end of this term or one more term, whenever it takes,
 8   whenever the Mercedes trial is concluded, we are no longer
 9   seeking deferred action.
10        THE COURT:  Is the only outstanding matter the
11   Mercedes trial?
12        MR. QUIGLEY:  Yes, your Honor.
13        THE COURT:  Now, as I read Homeland Security's letter,
14   it required Mr. Hunt to monitor the actions of the individual
15   and require him to report to a controlling agent or officer
16   regularly?
17        MR. QUIGLEY:  Right, your Honor.
18        THE COURT:  Where is Mr. Hunt?
19        MR. QUIGLEY:  Mr. Hunt is the special agent in charge
20   of the DEA New York Office, or was.
21        THE COURT:  I know who he is.  I am asking where he
22   is.
23        (Off-the-record discussion)
24        MR. QUIGLEY:  Your Honor, Ms. Donaleski said the
25   controlling agent from New York DEA, a man named Agent king,
```

H66JGUES                          Sentence

1    Joe King, would be here if Mr. Guerrero were released from

2    custody today and act as his controlling agent.

3            THE COURT:  Where is Mr. King today?

4            MR. QUIGLEY:  Your Honor, he is in Manhattan.  He is

5    here.  If Mr. Guerrero were sentenced to a time-served sentence

6    today, he would be down here.  He is ready and prepared to --

7            THE COURT:  I gather that prior to this deferred

8    action on June 2, 2017, there was an immigration detainer

9    lodged against Mr. Guerrero.  Is that correct?

10           MR. QUIGLEY:  That's correct, your Honor.

11           THE COURT:  And the submission of this letter had the

12   effect of lifting the immigration detention?

13           MR. QUIGLEY:  Yes.

14           THE COURT:  Mr. Quigley, are you planning on filing an

15   immigration detainer -- I guess if he is released, there is no

16   point.  If he has gone to the wind, there is nothing you can

17   do, I guess, correct?

18           MR. QUIGLEY:  Your Honor, if he is released, he is

19   still on supervised release, he is still subject to the terms

20   and conditions of the deferred action.

21           He has been told the terms of his immigration status.

22   I personally told him repeatedly in the three years or so I

23   have known him, and I know Ms. Korenbaum and other predecessors

24   have told him the same thing, that after his cooperation is

25   done, he is getting deported, there is no question about it.

H66JGUES                        Sentence

1          So he has known, that is one of the factors that plays

2     into the 5K analysis, he being deported to the DR, whether he

3     is sentenced to additional custody today and an immigration

4     detainer is put back in place and he gets released sometime

5     after the Mercedes trial, he is getting deported.

6          Whether he is sentenced to time-served and gets out

7     today and is subject to the deferred action after his

8     cooperation is complete, he is getting deported.  That is what

9     he has known and has been told about by me repeatedly and I

10    know by Ms. Korenbaum before.

11          THE COURT:  Why did you apply in advance of the

12    sentencing for this relief?  Why didn't you wait and see what

13    the sentence was to see whether it was necessary to make such

14    an application?

15          MR. QUIGLEY:  Your Honor, I think because our

16    understanding from speaking to Immigration was that if the

17    court were to sentence him to time-served and he were put into

18    immigration custody, his deportation could occur relatively

19    quickly.

20          The deferred action takes some time to take place.

21    That is why we adjourned sentencing numerous -- at least once,

22    I believe.  So if he was sentenced to time-served today and,

23    say, it took us four months or five months or six months to get

24    a deferred action in place, which requires very high level

25    approvals, he could be back in the DR at that point because he

1    has been deported.  It is a belt and suspenders to make sure he

2    would be available for Mercedes trial.

3         THE COURT:  Mr. Smith has argued -- and I am

4    paraphrasing, and I think Mr. Smith is a fine lawyer and has

5    been very careful with his words, paraphrasing may be more

6    imperfect than his actual words, but in essence that the time

7    that Mr. Guerrero spent on the charge to which he was convicted

8    before Judge Berman, which was a single Hobb's Act robbery, as

9    it has been described to me, should really be taken into

10   account as part of the time that he served on the charges to

11   which he is being sentenced today, that they're all one and

12   that it should be considered as essentially one sentence.

13         Again that is an imperfect paraphrase, but what is

14   your position on that?

15         MR. QUIGLEY:  I would say I would have two points in

16   response to that, one legal, one factual.

17         The legal point is I believe the court could as a

18   legal matter count that time as time-served on the current

19   offense under Title 18 U.S. Code 3585 (b)(2), which allows

20   credit for time-served in prior custody as a result of any

21   other charge for which the defendant was arrested after the

22   commission of the offense for which he was arrested for the

23   sentence imposed.  Here obviously on this case, all the offense

24   conduct predated the defendant's 2002 arrest for that robbery.

25   So if the court ordered this sentence to go concurrently with

1     that sentence, he could be credited as time-served.

2            I would say as a factual matter, I am not sure, the

3     2002 arrest was for a single robbery with a firearm that

4     occurred in the Bronx in 1997.  So that was a single arrest.

5     Obviously, that was in a different -- he was sentenced in a

6     pre-Booker era when the guidelines were mandatory, so that may

7     have informed some of his sentence there.  Obviously, the two

8     murders were not relevant conduct for that.  That offense

9     conduct could not have been more serious.

10            THE COURT:  Let me ask you, and I'll get back to your

11    thought in a moment, but have you notified the Ochoa family and

12    the Diaz family, and I think is it Rosario, the individual who

13    was shot, have you notified them of today's sentencing?

14            MR. QUIGLEY:  Yes, our investigator contacted them.

15            THE COURT:  So they're aware of today's sentencing?

16            MR. QUIGLEY:  That is my understanding.

17            THE COURT:  Is there any victim present in the

18    courtroom or member of a victim's family who wishes to be heard

19    today?  If so, please identify yourself.  All right.

20            Can you please -- yes, it was Mr. Rosario was the

21    other victim?

22            MR. QUIGLEY:  Yes.

23            THE COURT:  If you could please send a letter to me

24    confirming that, in fact, the Rosario, Diaz and Ochoa families

25    were notified of today's sentence.

1          MR. QUIGLEY:  Yes, your Honor.

2          THE COURT:  Go ahead.  I interrupted you.

3          MR. QUIGLEY:  What I was saying, your Honor, I think

4     obviously the two murders were not -- whether it was part of

5     other robberies, may have been included as part of a robbery

6     conspiracy, relevant conduct, I think the two murders are above

7     and beyond what the defendant was sentenced for in 2002 as a

8     result of his -- sorry, 2004.

9          That said, the defendant's cooperation post-2005 was

10    extremely significant.  It would have been -- I do agree with

11    Mr. Smith it would have been very easy for the defendant not to

12    reach back out to the government at the end of 2005, to go on

13    his way and serve his 120-month sentence, he would have gotten

14    out sometime in 2011, been deported to the Dominican Republic

15    and that would be that.

16         Mr. Gracesqui would have served the charges he was

17    sentenced for in the Eastern District, would have been out,

18    gone on his way.  He may have been roaming the streets in New

19    York.  However, the defendant, Mr. Guerrero, made a choice to

20    cooperate, and he had no notice -- as we said in the letter, he

21    would have been charged with the Diaz or Ochoa murders but for

22    his cooperation.  There were no other individuals cooperating

23    with first-hand information about who actually committed those

24    murders at the time.  He would never have been charged but for

25    his cooperation.  So he made a choice in 2006 that led to Mr.

Gracesqui's arrest, prosecution and conviction.  He also made a

choice in 2011 because you could say in 2006 well, maybe he

thought I'll cooperate and get out a few years earlier.  He

didn't sign a cooperation agreement until 2011.

        At that point, his 2002 sentence was coming to an end.

He again could have said you know what, I talked to the

government, but I see the light at the end of the tunnel with

my 120-month sentence, and I am just going to go on my way.

Again Mr. Gracesqui hadn't been charged yet, Mr. Mercedes

hadn't been arrested yet.  He didn't have to sign a cooperation

agreement in 2011, but he did, and he knew by signing that, he

would be lining himself up for more time in prison and for a

potential life sentence.

        THE COURT:  Well, having disclosed the murders to the

government under some sort of a proffer agreement, it probably

would have been a little bit difficult for him to just walk out

of the jailhouse and go about his business.

        MR. QUIGLEY:  It is under a proffer agreement, your

Honor, it can't be used against him in his case in chief.

        THE COURT:  That doesn't mean you couldn't investigate

it.

        MR. QUIGLEY:  True, your Honor.  But again he made a

choice in 2011 to cooperate.  I think another factor in

highlighting the choice that the defendant made is the risk

that he exposed himself to.  Whether or not he would have been

1    eventually charged with those murders, I don't think he would

2    have, and I have read obviously extensively in preparation for

3    the Gracesqui trial, the entire investigative trial.  I don't

4    think he would have been independently -- we would not have

5    been able to charge him for those murders but for his

6    cooperation.

7            Not only did he expose himself to legal jeopardy by

8    cooperating, but he put himself in significant physical

9    jeopardy.  He has now testified as a cooperator in a public

10   trial.  There is no denying he is a cooperator.  Even if we

11   were to keep everything sealed, the transcript of that trial is

12   now public.  He is likely going to testify in another trial

13   either later this year or early next year.  That transcript

14   will be public.  I said before he will go back to the Dominican

15   Republic where, frankly, there is not going to be a Drug

16   Enforcement Administration investigator who is able to kind of

17   watch out for him or NYPD officer, there is not going to be

18   911.

19           There will be the families of people who he testified

20   against, one of whom he has been in responsible in large

21   measure for putting in prison for life, who may well retaliate

22   against him.  It is also significant that we say this in our 5K

23   letter, but it is not just the two murders, it is his

24   cooperation led to the arrest of numerous other drug robbers,

25   extremely violent people, many of whom themselves cooperated.

1          So it had in a way an exponential effect, and now he

2     has been out as a cooperator publicly.  Those people who got

3     arrested are aware of his cooperation, and he may be subject to

4     retaliation, especially once he goes back to the Dominican

5     Republic.  The offense conduct here, there is no question it

6     could not be more serious.

7          At the same time, the defendant, having accepted

8     responsibility for that, by doing that, he placed himself in

9     legal jeopardy he would not otherwise be in and he placed

10    himself and his family, frankly, in physical jeopardy they

11    would not otherwise be in.

12         THE COURT:  The government has had the option to seek

13    to put this individual in the Witness Security Program,

14    correct?

15         MR. QUIGLEY:  I think the immigration issue bars him

16    from that, your Honor.

17         THE COURT:  All right.  Even with deferred action?

18         MR. QUIGLEY:  Yes.  Your Honor, deferred action is

19    just to preserve his availability, preserve a witness's

20    availability to testify or assist the government.

21         THE COURT:  But for the period of time that he is a

22    cooperator, your representation is that the Witness Security

23    Program would not allow him, while he is in the deferred action

24    status, to be in the Witness Security Program?

25              (Off-the-record discussion)

1          MR. QUIGLEY:  Your Honor, potentially he could be, but

2    the problem is we could not start a WITSEC application until he

3    got the deferred action, until he got the deferred action yet

4    or today or yesterday, but then the WITSEC, placing him in

5    WITSEC would take some time, a period of at least a number of

6    months, typically what it would take for the deferred action.

7          THE COURT:  Are you planning on doing that in his

8    case?

9          MR. QUIGLEY:  We can assess it, your Honor, depending

10   on what he is sentenced to, obviously.  We didn't know until

11   yesterday he was actually going to get the deferred action.

12         THE COURT:  Anything else?

13         MR. QUIGLEY:  No, your Honor.

14         THE COURT:  Thank you very much.

15         I'll take a brief recess.

16         (Recess)

17         THE COURT:  Please be seated.

18         This is the court's statement of reasons for the

19   sentence to be imposed on Julio Diego Guerrero.

20         In sentencing the defendant, I have considered all of

21   the materials that I've referenced at the outset of this

22   proceeding.  I have considered the very thoughtful and helpful

23   statements of Mr. Smith and Mr. Quigley, who have both

24   acquitted themselves quite well today in responding to the

25   court's questions and in laying out their candid thoughts.

1    I've considered the sincere statement of Mr. Guerrero.  I have

2    considered each of the factors set forth in Section 3553 (a).

3    I need not recount all that I've considered, but I have

4    considered them all.

5        The defendant in this case was a member of a crew that

6    committed violent robberies, kidnappings and beatings of drug

7    dealers, and he and his co-conspirators carried and brandished

8    guns during these robberies.

9        He was buying, Mr. Guerrero was buying wholesale

10   quantities of heroin from Frank Mercedes, a major drug dealer.

11   Mercedes got in touch with Guerrero and told him one of his

12   customers, Jorge Rosario, had stolen two kilograms of heroin

13   from Mercedes' stash house, as I remember it from the trial.

14   Initially Mercedes asked for Guerrero's help in beating Rosario

15   up, but then indicated he wanted him killed.

16       Guerrero contacted Velez-Gomez and Gracesqui, and the

17   two of them met with Mercedes, and Mercedes indicated he wanted

18   Rosario killed, and Guerrero and the others agreed to do so.  I

19   remember at the trial there was dispute in the testimony as to

20   what the actual price was, but it was in the neighborhood of

21   $30,000.  Mr. Guerrero and others surveilled Mr. Rosario, and

22   they saw him in a car with another person, began following

23   them.  When the car stopped, Gracesqui got out of the car and

24   began shooting, shot Rosario and the driver of the car, Richard

25   Diaz.  Rosario sustained injuries, but lived.  Diaz died.

1            Guerrero committed a whole series of robberies,

2     robberies on multiple occasions of kilogram levels of cocaine,

3     of U.S. Currency.  These were all robberies.  There were

4     also -- most of them were robberies.  There were a few that

5     were burglaries of the 40, but most of them were robberies or

6     attempted robberies.

7            Diaz, who was murdered, was not involved in the drug

8     trade.  He was simply an innocent who happened to be in the car

9     with his cousin that day.

10           The defendant has also pled guilty in connection with

11     aiding and abetting the discharge of a firearm by Gracesqui

12     during an attempt to rob John Ochoa, resulting in the death of

13     John Ochoa.  When you commit armed robbery, and someone

14     resists, this is a foreseeable consequence.

15           The defendant has done all the things which I

16     indicated, but he did something right.  He cooperated in this

17     case.  He agreed to provide truthful and valuable testimony

18     that has resulted in other people being successfully prosecuted

19     for their crimes, including Mr. Gracesqui, who is now doing

20     life without the possibility of parole.

21           Mr. Guerrero has a criminal history throughout his

22     life, including attempted possession of a controlled substance

23     for which he received time-served, attempted possession of a

24     weapon, which was as a result of a search of a vehicle,

25     revealing three loaded firearms, a .32 caliber revolver, a .38

1    caliber revolver, 223 semiautomatic rifle with its serial

2    number obliterated.  Mr. Guerrero was sentenced to a term of

3    probation.  He violated the terms of his probation and was

4    sentenced to one to three years in prison.

5            Thereafter, in New Jersey, in connection with

6    possession of a controlled dangerous substance, with intent to

7    distribute, he received a term of seven years in prison.

8            At age 34, he was found operating a motor vehicle with

9    a suspended license and improper headlights, with three decks

10   of heroin in the front seat of the car, for which the New York

11   State authorities imposed a sentence of conditional discharge

12   and five days of community service.

13           At age 35, criminal possession of a controlled

14   substance, for which the New York State authorities gave him a

15   sentence of time-served, which was two days, and a six month

16   suspension of his driver's license.

17           As noted, he was sentenced on a single Hobb's Act

18   robbery and use of a firearm, for which he received a sentence

19   of 122 months in prison.

20           The defendant used cocaine on weekends and snorted

21   heroin on a daily basis, having a $200.00 a day habit and no

22   real employment.  He did have some off-the-books work as a

23   welder in 1983-86 and again '99 through 2002.

24           The defendant faces under the guidelines, before the

25   government's departure motion, he faced a maximum of 20 years

H66JGUES                        Sentence

on Count 1, a mandatory minimum of 20 years to life on Counts 2

and 3, and on Count 4 a mandatory and consecutive 25 year term,

on Count 4 which could be up to life in prison.

          So according to the presentence report to which there

has not been an objection, he faced 360 months to life plus a

mandatory and consecutive 300 months imprisonment.  As noted,

Mr. Guerrero made the wise decision to admit his crimes, to

come forward with information about crimes that the government

was not aware of.

          I acknowledge that Mr. Guerrero has spent difficult

time because he has been at the MCC and the MDC.  I acknowledge

that he has put himself at risk by cooperating.  I acknowledge

that he has a strong family unit in this country.

          It is also the case that upon completion of his

cooperation, he will be deported to the Dominican Republic

because the government has indicated that they will notify

Homeland Security when the cooperation is completed and will

not, based on facts as they exist today, make any further

application for him to remain in the United States.

          Based upon all the surrounding circumstances, I intend

to follow the recommendation of the Probation Office and

sentence the defendant to a 120 months imprisonment on each of

Counts 1 through 4, to run concurrently with each other.

However -- well, actually, it is consistent with the

recommendation and also my own views, he will be placed on

supervised release for five years on Count 2 and five years on

Counts 3 and 4, and three years on Count 1, all to run

concurrently.  Based on limited assets, limited earning

ability, the fine will be waived.

          Is forfeiture sought in this case?

          MR. QUIGLEY:  No, your Honor.

          THE COURT:  I will impose a special assessment of

$400.00.  The foregoing is, in my view, sufficient but not

greater than necessary to achieve the purposes of Section 3553

(a).  Does the defendant or his counsel have any objection to

the court's proposed sentence or the statement of reasons for

that sentence?

          MR. SMITH:  No legal objection, your Honor.

          THE COURT:  The same question for the government?

          MR. QUIGLEY:  No, your Honor.

          THE COURT:  All right.  Mr. Guerrero, you'll please

stand, and I will impose sentence.

          Julio Diego Guerrero, it is the judgment of this Court

you're hereby sentenced to be imprisoned by the United States

Bureau of Prisons for a period of 120 months on Counts 1, 2, 3

and 4, to run concurrently with each other.  Following release

from imprisonment, you shall be placed on supervised release

for five years on Counts 1, 2 -- I am sorry -- Counts 2, 3 and

4, and three years on Counts 1, all to run concurrently with

the following terms and conditions:

1          You shall not commit another federal, state or local

2     crime, nor illegally possess a controlled substance, nor

3     possess a firearm or destructive device.  The mandatory drug

4     testing is suspended based on the court's determination that

5     you pose a low risk of future substance abuse.

6          I am going to impose the standard drug testing

7     condition in this case.  You shall cooperate in the collection

8     of DNA as directed by the probation officer.  You shall submit

9     your person, residence, place of business, vehicle and any

10    other property or electronic device under your control to a

11    search, on the basis that the probation officer has reasonable

12    suspicion that contraband or evidence of a violation of

13    conditions may be found.  The search must be conducted at a

14    reasonable time and in a reasonable manner.  Failure to submit

15    to a search may be grounds for revocation.  You shall inform

16    any other residents that the premises may be subject to search

17    pursuant to this condition.

18         You shall participate in an outpatient treatment

19    program approved by probation, which program may include

20    testing to determine whether you have reverted to using drugs

21    or alcohol.  You shall contribute to the costs of services

22    rendered, based on ability to pay and availability of

23    third-party payment.  The court authorizes the release of

24    available drug treatment evaluations and reports, including the

25    PSR, to the substance abuse treatment provider.

1    You shall obey the immigration laws of the United

2    States and comply with the directives of immigration

3    authorities.  You shall report to the nearest Probation Office

4    within 72 hours of release from custody.  It is further ordered

5    that you shall pay to the United States a special assessment of

6    $400.00, which shall be due immediately.  As indicated, the

7    fine is waived based on limited assets and limited earning

8    ability.

9    Mr. Guerrero, you have the right to appeal the

10   sentence the court has imposed on you.  If you cannot afford

11   the cost of an appeal, you may apply for leave to appeal as a

12   poor person.  The time limits for filing a notice of appeal are

13   brief and they're strictly enforced.  If you request, the Clerk

14   of Court will prepare and file a notice of appeal on your

15   behalf immediately.

16   Do you understand all that?

17   THE DEFENDANT:  Yes.

18   THE COURT:  Please be seated.

19   Is there anything further from the government?

20   MR. QUIGLEY:  No, your Honor.

21   THE COURT:  Anything further from the defense counsel?

22   MR. SMITH:  No, your Honor.

23   THE COURT:  Mr. Guerrero, I wish you the best in

24   completing the remaining time on your prison term.  Your

25   counsel advises that it is something on the order of about

H66JGUES                        Sentence

1    three years, and I hope that when your prison term is

2    completed, that you go on to live a long and healthy life.

3            We are adjourned.

4            (Court adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25